WRITTEN BY: Jon Bruning, Attorney General
Charles E. Lowe, Assistant Attorney General
Section 2 of LB 235, currently pending on general file in the 101st Legislature, would allow the Board of Educational Lands and Funds ("BELF") to "enter into contracts for the sale of carbon sequestration rights, also referred to as exchange soil offsets, under such terms and conditions as the board shall deem appropriate for durations not exceeding ten years." In this context you have asked this office for its opinion as to whether or not carbon sequestration rights on land owned and managed by BELF are minerals or natural resources within the meaning of Neb. Const. art. III, § 20 and, if so, whether or not that constitutional provision "prohibit[s] BELF from transferring carbon sequestration rights to its lessees." *Page 2 
 Discussion
Carbon Sequestration and Carbon Sequestration Rights
In order to respond to your inquiries it is first necessary to have an understanding of what "carbon sequestration" and "carbon sequestration rights" are. These are both terms that have come into some prominence because of efforts to reduce or limit the amount of greenhouse gases, primarily carbon dioxide, that are released into the atmosphere by human activities.
We have found nothing in the Nebraska statutes or Nebraska case law that defines or describes in any detail "carbon sequestration." Neb. Rev. Stat. § 2-5301 (2007), in stating the legislative intent for enactment of a scheme to assess agricultural lands in the state for past carbon sequestration and future carbon sequestration potential and to set up an advisory committee on the subject, provides only the following very general description: "Improved agricultural production methods, soil conservation practices, and other methods of stewardship of soil resources have great potential to increase carbon sequestration on agricultural lands and help offset carbon dioxide emissions from other sectors of the economy,"
Other sources have more specific definitions of "carbon sequestration." For example, the Pennsylvania Climate Change Act states that, for purposes of that act, carbon sequestration is: "The long-term storage of carbon or carbon dioxide in forests, forest products, soils, oceans or underground in depleted oil and gas reservoirs, coal seams and saline aquifers." 71 Pa. Cons. Stat. § 1361.2 (2009). A private company involved in carbon sequestration projects in Australia has provided a similar definition: "Carbon sequestration means the long-term storage of carbon or CO2 in the forests, soils, oceans or underground in depleted oil and gas reservoirs, coal seams and saline aquifers."www.greeningthedesert.com/glossary.htm (last visited on 12/14/09).
Assuming that underground storage of carbon and carbon dioxide is not what is contemplated by LB 235 and your inquiries, we believe that the following definition set forth by the government of the state of Western Australia in a pamphlet called "Carbon rights in WA — a new interest in the land" (2005) is most apt: "Carbon sequestration in this instance means the absorption from the atmosphere of carbon dioxide by vegetation and soils; and the storage of carbon in vegetation and soils."Id. at 1 (found at
http://www.agric.wa.gov.au/objtwr/imported assets
(lasted visited on 12/28/09)). Another, similar definition of "carbon sequestration" is: "The uptake and storage of atmospheric carbon in, for example, soil and vegetation." McGraw-Hill *Page 3 
Dictionary of Scientific and Technical Terms (6th ed.), found at http://www.answers.com/topic/carbon-sequestration (last visited on 12/16/09).
A "carbon sequestration right" in relation to land means a right conferred on a person, by agreement, statute or otherwise, to the legal, commercial or other benefit of carbon sequestration (present or future) on any given parcel of land. See, Tasmanian Forestry Rights Registration Act of 1990, § 3 (found at http://www.thelaw.tas.gov.au/print/index.w3p
(last visited on 12/11/09));www.greeningthedesert.com/glossary.htm (last visited on 12/14/09). In other words, a "carbon sequestration right" is the right to the benefit of the absorption and storage of carbon dioxide and carbon by the vegetation and soils on any given parcel of land. Carbon sequestration rights may have financial value where a market exists for greenhouse gas emission offsets.
A Guide called "Soil Carbon Sequestration Contracts" published by University of Missouri Extension in September, 2009 (found at http://extension.missouri.edu/publications/DisplayPub.aspx? (last visited on 12/14/09)) sets forth the following discussion which is helpful in understanding what LB 235 seeks to achieve and the questions you have posed in that context:
 Agriculture has become a player in world greenhouse gas markets by providing carbon credits in the form of soil sequestration (crop and rangeland), methane capture and forest sequestration. In order to provide these carbon credits, agricultural producers enter into a contractual arrangement with the market. Within the framework of the carbon credit market, soil sequestered carbon credits are referred to as exchange soil offsets.
 The parties involved in soil carbon sequestration contracts are the farmer [or non-farming landowner], the aggregator and the market. . . . [T]he term "farmer" . . . refer[s] to the person actually providing the carbon offset to the market. A nonfarming landowner can also enter into a contract to supply carbon offsets as long as he ensures that the one farming his land complies with the specifications of the contract. Aggregators are businesses that assemble many small providers of soil carbon offsets, then register and sell those offsets on the market. Currently the major, but not sole, market in the United States is the Chicago Climate Exchange. . . . *Page 4 
 The contracts offered by aggregators to farmers must follow the rules of the Chicago Climate Exchange (CCX) for exchange soil offsets
(XSO's).
Id. at 1 (emphasis in original).
Carbon Sequestration and Neb. Const. art. III, § 20
With the foregoing understanding of the terms "carbon sequestration" and "carbon sequestration right" and of the marketing of carbon offsets, we turn to your question as to whether or not carbon sequestration rights fall within Neb. Const. art. III, § 20.
In full, Neb. Const. art. III, § 20 reads as follows: "The salt springs, coal, oil, minerals, or other natural resources on or contained in the land belonging to the state shall never be alienated; but provision may be made by law for the leasing or development of the same," There are but a handful of Nebraska cases dealing with this constitutional provision; and none of them provide any useful guidance in determining whether rights to the benefit of carbon sequestration occurring in soil and vegetation on state-owned lands fall within its parameters. The drafters of the amendment which became art. III, § 20 simply stated that the purpose of the provision was "to preserve to the people of the state the benefit of the remaining natural resources belonging to the state." Proceedings of the Constitutional Convention 1919-20, vol. II, p. 2842. There is no further explanation.
Nevertheless, it is readily apparent that carbon sequestered in soil and vegetation on state lands is neither "salt springs," "coal" nor "oil" as those terms are commonly understood. Therefore, carbon sequestration rights are not implicated by those items listed in art. III, § 20.
Likewise, we do not believe that atmospheric carbon stored in soil and vegetation as described above could fairly be understood to be a "mineral" on state land. The word "mineral" is generally defined as "an inorganic substance occurring naturally in the earth and having a consistent and distinctive set of physical properties (e.g., color, hardness, and crystalline structure) and a composition that can be expressed by a chemical formula." Webster's New Universal Unabridged Dictionary (2d ed. 1983) at 1145. Atmospheric carbon sequestered in soil and vegetation would not, we think, fall within this definition and would not have been thought of as a "mineral" by the Nebraska voters who approved the inclusion of art. III, § 20 in the state constitution. Accordingly, the "alienation" of carbon sequestration rights on state-owned lands is not prohibited by the "minerals" provision of art. III, § 20. *Page 5 
The question of whether carbon sequestration rights are "other natural resources on or contained in the land belonging to the state" is more difficult, especially since we have found no case law precedent addressing this or any similar issue. We have, however, concluded that it is most likely that carbon sequestration rights would not be deemed by a court to be "natural resources," as that term is used in Neb. Const. art. III, § 20.
Initially, from an overall reading of art. III, § 20 it seems to us that the drafters and ratifiers of that provision would not have been contemplating that the rights to the retention of atmospheric carbon on a parcel of land owned by the state would themselves be natural resources. Rather, by specifically referring to salt springs, coal, oil and minerals and by referring to leasing and development in the second clause of art. III, § 20, it appears that that section is addressed to natural resources that can be extracted from the land (and which are irreplaceable on the land) and/or used on the land in a commercially viable manner. See,State ex rel. Central Realty Investment Co. v. McMullen,119 Neb. 739, 742, 230 N.W. 677, 678 (1930) (stating that the purpose of art. III, § 20 "was to prevent the alienation by the state of salt springs of commercial value").
Additionally, while the term "natural resources" can certainly have a broad meaning as "those actual and potential forms of wealth supplied by nature," Webster's New Universal Unabridged Dictionary (2d ed. 1983) at 1197, we think the structure of art. Ill, § 20 limits that definition in that context. There is a familiar rule of statutory and constitutional construction that is referred to by the courts as "ejusdem generis." This rule is described as follows:
 Under the "ejusdem generis" canon of construction, when a general word or phrase follows a list of specific persons or things, the general word or phrase will be interpreted to include only persons or things of the same type as those listed. Dykes v. Scotts Bluff Cty. Ag. Socy., 260 Neb. 375, 617 N.W.2d 817 (2000). Thus, under the "ejusdem generis" rule, specific words or terms modify and restrict the interpretation of general words or terms where both are used in sequence. Id.
Nebraska Liquor Distributors, Inc. v. Nebraska Liquor ControlCommission, 269 Neb. 401, 410, 693 N.W.2d 539, 547 (2005).Accord, Kuhn v. Wells Fargo Bank of Nebraska, N.A., 278 Neb. 428,445-46, 771 N.W.2d 103, 118-19 (2009).
Applying the ejusdem generis principle to art. III, § 20 it appears to us that the term "natural resources" in that provision is to be limited so as to include only "things of the same type" as salt springs, coal, oil and minerals. These all appear to be resources that obtain their value from the fact that they can be extracted *Page 6 
from the land and sold in a commercially viable manner or used on the land in such manner. The items specifically listed in art. III, § 20 are all such that once they are removed from a tract of land, they no longer exist on the land, nor can they be replaced. This interpretation of the term "natural resources" in art. III, § 20 is supported by the fact that that section specifically permits the "leasing or development" of those items which cannot be "alienated."
It seems to us that carbon sequestered on a parcel of land does not fit within those parameters. The value of carbon sequestration rights lies not in the fact that atmospheric carbon stored in the soil and vegetation can be released through certain human activities but, rather, from the fact that atmospheric carbon can be, and is, absorbed and retained in the soil and vegetation. Carbon sequestration, therefore, does not appear to be a "thing" of the "same type" as salt springs, coal, oil and minerals and is not a "natural resource" contained in the land as that term is used in the constitutional provision. In our view carbon sequestration rights do not appear to come within the purview of Neb. Const. art. III, § 20.
"Alienation" of Natural Resources under Neb. Const.art, III, § 20
In your letter to this office you ask whether, if carbon sequestration rights are covered by Neb. Const. art. Ill, § 20, that constitutional provision "prohibits BELF from transferring carbon sequestration rights to its lessees." While it is our opinion that carbon sequestration rights are not encompassed within the prohibitions of art. Ill, § 20, we will address this question assuming, for the sake of discussion, that a court disagrees with our conclusion and determines that carbon sequestration rights are "natural resources" within the meaning of the constitutional provision.
It is somewhat difficult to reply to your second question because you do not define what you mean by "transferring" the carbon sequestration rights to BELF's lessees. Since "lessees" are, by definition, possessors of the land pursuant to term-limited lease agreements, we will assume that you mean any transfer of rights to lessees would last only as long as the leases themselves and would not be an outright sale of the carbon sequestration rights for all time. We also note that pending LB 235 would allow the "sale" of carbon sequestration rights by BELF "for durations not exceeding ten years."
The key issue here is whether the term-limited "transfer" or "sale" of carbon sequestration rights on BELF lands amounts to an "alienation" of such rights under Neb. Const. art. III, § 20. As discussed above, there is little case law involving that constitutional provision and none that directly addresses the meaning of the word "alienated" as used therein. The Nebraska Supreme Court *Page 7 
has, however, said that when the constitution was amended in 1920 and art. III, § 20 was added it made it illegal "to deed away" mineral rights on school lands. Reavis v. State,140 Neb. 442, 447-48, 300 N.W. 344, 346 (1941).
In Butler v. Fitzgerald,43 Neb. 192, 204, 61 N.W. 640 (1895), the supreme court discussed the word "alienate" as used in connection with property generally.
 The word "alienate" means: "To transfer property to another; to make a thing another man's. In common law to alienate realty is voluntarily to part with ownership in it, by bargain and sale, conveyance, gift or will." "Alienation" means: "An act whereby one man transfers the property and possession of lands, tenements, or other things to another." (Quoting from Anderson's Law Dictionary.)
See also, Hiles v. Benton,111 Neb. 557, 561-62, 196 N.W. 903, 904 (1924) (quoting 2 C.J. 1035 as saying that the definition of "alienation" includes "the voluntary and complete transfer of property from one person to another").
When the foregoing common law definitions of "alienate" are considered in light of the court's declaration that art. Ill, § 20 is meant to prevent the state from "deed[ing] away" the items listed in the constitutional provision, it must be concluded that what is prohibited is the permanent sale and transfer of those particular natural resources. This conclusion is reinforced by the language of art. III, § 20 that specifically permits the "leasing or development" of these resources.
It appears from both the language of LB 235 and your letter that what is contemplated is not a permanent sale or transfer of the right to benefit from carbon sequestration occurring in the soil and vegetation on BELF-managed property. Rather, as noted above, the carbon sequestration rights (or exchange soil credits) would simply be "transferred" or "sold" for a limited period of time. Ultimately, such rights would come back to the "owner" of the land — the people of the state through BELF. If our understanding in this regard is correct, it is unlikely that the "alienation" prohibited by art. III, § 20 would take place. Thus, such arrangements would not be in violation of that constitutional provision.
 Conclusion
In response to the two questions you have posed it is our opinion that: (1) carbon sequestration rights (or exchange carbon offsets) are not minerals or natural resources for purposes of Neb. Const. art. Ill, § 20 and (2) even if carbon sequestration rights were deemed to be "natural resources" within the meaning of art. III, § 20, the time-limited "sale" or "transfer" of such rights, as contemplated *Page 8 
by LB 235 and your inquiry, would not be considered an "alienation" of those rights prohibited by the constitutional provision.
Sincerely yours,
 JON BRUNING Attorney General
 Charles E. Lowe Assistant Attorney General
 Approved by: ________________________ Attorney General *Page 1